Filed 4/18/13  P. v. Sagastume CA2/7

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| THE PEOPLE, | B242541 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BA389197) |
| v. | |
| FREDDY SAGASTUME, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Clifford Klein, Judge.  Affirmed.

Linn Davis, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, James William Bilderback II and Stephanie C. Santoro, Deputy Attorneys General, for Plaintiff and Respondent.

_____

# INTRODUCTION

Defendant Freddy Sagastume appeals from a judgment of conviction entered after a jury trial. The jury found defendant guilty of attempted murder (Pen. Code, §§ 187, subd. (a), 664) in count 1, and assault with a deadly weapon (*id*., § 245, subd. (a)(1)) in count 2. As to count 1, the jury found true the allegation that defendant personally used a deadly and dangerous weapon (*id*., § 12022, subd. (b)(1)), and the jury found true as to both counts the allegations that defendant personally inflicted great bodily injury on the victim (*id*., § 12022.7, subd. (a)).

On count 1, defendant was sentenced to 11 years in state prison: the midterm of seven years, plus one year for personal use of a knife and three years for infliction of great bodily injury. A sentence as to count 2 was imposed and stayed pursuant to Penal Code section 654.

On appeal, defendant contends that the pretrial identification process was impermissibly suggestive. We affirm.

# FACTS

On September 18, 2011, Nelson Guzman (Nelson), the victim, was living in an apartment complex.[1] He went out to dinner with a girlfriend at about 9:30 p.m. Defendant and his girlfriend, Karla Velasquez (Velasquez), were at Velasquez's apartment, which was next door to Nelson's apartment complex.

Nelson returned home in a taxi at about 2:00 a.m. He had consumed six or seven beers and was intoxicated. Nelson saw defendant, who was approximately 10 feet away in the parking lot, as he walked to his apartment. There were three men with defendant.

---

[1] Nelson died prior to trial, and his preliminary hearing testimony was read to the jury.

Nelson went into his apartment to see if his two daughters, Martha and Tania, were asleep.

When Nelson came back out, defendant was talking to his friends, and Velasquez was several feet away from them. Nelson approached Velasquez and asked her what she was drinking. She said beer, and Nelson attempted to get close to her to smell her. Nelson grabbed her arm and asked her to come with him to get drinks. Velasquez pushed Nelson away. Defendant approached Nelson and said, "Hey, that's my girl." Nelson backed away and apologized, saying "We're good, right?"

At some point, defendant came up to Nelson and stabbed him five times in the stomach. Nelson was certain it was defendant who stabbed him because defendant was right in front of him.[2]

Martha and Tania, who were in Nelson's apartment, heard screaming and loud voices. Tania heard bad words in Spanish spoken by a woman; the woman was saying, "Cabron, leave him alone." Neither Martha nor Tania saw the stabbing.

Martha and Tania looked out and saw defendant and Velasquez arguing. They heard Velasquez screaming, "Let's go," while trying to pull defendant away.

Tania saw her father bleeding. Tania noticed that defendant had something pointy in his hand. Martha head Velasquez say in Spanish, "We have to go." Martha and Tania saw Velasquez and defendant run down the street. As defendant and Velasquez ran down the street, two men attacked defendant with an iron pipe.

Martha recalled that she told officers the man she saw was Hispanic, with long hair, wearing a white T-shirt. She was unable to identify defendant's photograph. Martha did not recall giving a description to an officer of a man 5 feet 6 inches tall, weighing 200 pounds. Tania did not speak to the police at the scene of the crime.

---

[2] A six-minute video without audio was played for the jury. The video clip shows defendant, Velasquez and Nelson in the parking lot outside the apartment complex and a brief encounter between the parties. The video does not show the stabbing.

Nelson called 911. He said he had been stabbed with a knife outside his apartment by a Hispanic man with a dark complexion wearing a white shirt and blue pants.

Officer Tomas Perez responded to the scene. Officer Perez observed two men struggling to hold Nelson up. The two men refused to identify themselves. There were about 15 people present. Some did not want to be identified.

Officer Perez talked to Velasquez. Velasquez told Officer Perez she was in front of her apartment building with defendant when Nelson approached her and grabbed her by the arm. Nelson asked her if she wanted to have some drinks. Velasquez said that she and defendant walked away, and shortly thereafter, defendant was attacked by two men.

Officer Perez received information indicating that the man who stabbed Nelson drove a white van. Officers ran defendant's name and found that a white Dodge van was registered in his name. Velasquez told Officer Perez that defendant owned the white Dodge van that was parked in the apartment complex parking lot.

The knife was recovered two blocks away, along the route defendant and Velasquez took as they left the scene. Defendant's DNA was present on the knife handle in large quantities, indicating that defendant handled the knife on more than a single occasion. The knife blade contained a mixture of DNA belonging to Nelson and defendant.

Nelson was hospitalized for seven days for his wounds. Los Angeles Police Officer Hugo Villagrana interviewed Nelson at the hospital early on the morning of September 19. Nelson told Officer Villagrana that the stabbing resulted from a verbal altercation. Nelson said the person who stabbed him drove a white Dodge pickup that was usually parked in front of the apartment complex.

Detective Francisco Guzman went to interview Nelson at the hospital. Nelson was on a ventilator in the intensive care unit and unable to speak. Tania, who was present, told Detective Guzman that Nelson could hear questions and could nod his head in response.

Detective Guzman asked Nelson about the stabbing, read Nelson a photographic six-pack admonition in Spanish, and showed him a photographic six-pack lineup. Nelson

4

identified defendant. Because Nelson was unable to write, Detective Guzman had Tania write on the six-pack that she had witnessed her father's identification.

Detective Guzman learned that Tania had been present at the scene of the crime. Tania said she could identify the man that was arguing with Velasquez. Detective Guzman read her the photographic show up admonition. Tania identified defendant.

Detective Guzman interviewed Nelson two days later, when he was off the ventilator. Nelson identified defendant by name as the man who had stabbed him.

At the preliminary hearing, Nelson identified defendant as the person who stabbed him. He testified he was "sure" it was defendant who stabbed him because he saw defendant, who was "close" and right in front of him at the time of the stabbing.

## DISCUSSION

Defendant contends that Tania's eyewitness identification at trial followed a pretrial identification that was impermissibly suggestive and violated defendant's Fourteenth Amendment rights. While we agree that the pretrial identification was impermissibly suggestive, we hold that any error was harmless.

Unnecessarily suggestive identification procedures are conducive to irreparable mistaken identification. (*Foster v. California* (1969) 394 U.S. 440, 442 [89 S.Ct. 1127, 22 L.Ed.2d 402].) The admission in evidence of an identification which is unconstitutionally unreliable violates due process of law. (*People v. Johnson* (1992) 3 Cal.4th 1183, 1216; see also *People v. Cunningham* (2001) 25 Cal.4th 926, 989.) A pretrial identification procedure violates due process of law if it is "'so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification.'" (*People v. Blair* (1979) 25 Cal.3d 640, 659, quoting from *Simmons v. United States* (1968) 390 U.S. 377, 384 [88 S.Ct. 967, 19 L.Ed.2d 1247]; accord, *People v. Wimberly* (1992) 5 Cal.App.4th 773, 788.) Defendant bears the burden of establishing that an identification procedure was constitutionally defective. (*People v. Ochoa* (1998) 19 Cal.4th 353, 412; *People v. DeSantis* (1992) 2 Cal.4th 1198, 1222.)

"'The issue of constitutional reliability depends on (1) whether the identification procedure was unduly suggestive and unnecessary [citation]; and if so, (2) whether the identification itself was nevertheless reliable under the totality of the circumstances, taking into account such factors as the opportunity of the witness to view the criminal at the time of the crime, the witness's degree of attention, the accuracy of his [or her] prior description of the criminal, the level of certainty demonstrated at the confrontation, and the time between the crime and the confrontation [citation].'" (*People v. Ochoa*, *supra*, 19 Cal.4th at p. 412; *People v. DeSantis*, *supra*, 2 Cal.4th at p. 1222.)

The totality of the circumstances includes such factors as the opportunity of the witness to view the criminal during the commission of the crime, the witness's degree of attention, the accuracy of the witness's prior description of the criminal, the level of certainty as to the identification, and the time elapsed between the commission of the crime and the identification. (*People v. Cunningham*, *supra*, 25 Cal.4th at p. 989.) They also include such factors as to whether or not the identification procedures were "fair or 'rigged,'" and whether the police made suggestive comments to the witness. (*People v. Pijal* (1973) 33 Cal.App.3d 682, 689.)

Initially, the People assert that defendant's evidentiary claim is forfeited because defendant failed to object at trial to the admission of Tania's in-court identification. The People also contend that defendant's contention that the admission of Tania's testimony regarding her pretrial identification was improper was also forfeited. Pursuant to Evidence Code section 353, "A verdict or finding shall not be set aside, nor shall the judgment or decision based thereon be reversed, by reason of the erroneous admission of evidence unless: [¶] (a) There appears of record an objection to or a motion to exclude or to strike the evidence that was timely made and so stated as to make clear the specific ground of the objection or motion . . . ."

The People rely in part on *People v. Partida* (2005) 37 Cal.4th 428, which states that courts "'have consistently held that the "defendant's failure to make a timely and specific objection" on the ground asserted on appeal makes that ground not cognizable.'" (*Id.*, at pp. 433-434.) "'[A] specifically grounded objection to a defined body of evidence

6

serves to prevent error.'"  (*Id.* at p. 434.)  It allows the trial judge to exclude or limit admission of evidence to avoid prejudice and allows the proponent of the evidence to lay a foundation, modify the offer of proof, or take steps to minimize the chance of reversal. (*Ibid.*)

*Partida* did observe that the objection requirement must be interpreted reasonably, not formalistically.  Defendant claims that his objection to Tania's identification testimony fairly informed the trial court and the prosecutor what evidence should be excluded.

During cross-examination of Detective Guzman, defense counsel learned that Tania identified defendant's photograph after she witnessed her father identify the same photograph.  At that time, defense counsel approached the court and stated:  "I would make a motion to exclude her identification, your honor, on the photographic line-up. It's obviously tainted and, you know, so the jury should not even be considering it."  A discussion followed, and the trial court observed that the jury had already heard the identification.  The prosecutor argued that the circumstances surrounding Tania's identification went to the weight of the evidence rather than its admissibility.  The trial court denied the motion but indicated it would look into the matter further.

Ultimately, defense counsel made a motion for mistrial "based on the egregious nature of the whole photographic line-up procedure that was conducted in the hospital.  I think the whole procedure was tainted . . . ."  The court denied the motion for mistrial based upon other corroborating evidence.

There was a further discussion, and the trial court gave defendant two choices.  It could instruct the jury to ignore Tania's pretrial identification, or it could instruct the jury on impermissibly suggestive identifications.  Defense counsel correctly stated that "you can[not] un-ring the bell."  He selected the latter instruction and exclusion of the photographic six-pack.

It is clear that the trial court, prosecutor, and defense counsel were all aware of the issue of the tainted identification by Tania.  As *Partida* states, "What is important is that the objection fairly inform the trial court, as well as the party offering the evidence, of the

7

specific reason or reasons the objecting party believes the evidence should be excluded, so that the party offering the evidence can respond appropriately and the court can make a fully informed ruling." (*People v. Partida*, 37 Cal.4th at p. 435.)  Since that occurred here, defendant's evidentiary claims were not forfeited.

Defendant contends that Tania's pretrial identification, made after she witnessed her father's identification from the same photographic six-pack, was impermissibly suggestive.  The People point out that Tania believed she did not select the same person in her six-pack that her father selected.  Tania testified that she selected Photograph One, but her father selected Photograph Two:

"[Prosecutor:]  On this one.  On the one that you wrote, 'number one is the guy who was arguing,' et cetera.

"[Tania:]  Yes.

"[Prosecutor:]  You circled it and initialed it.  When you circled the picture and you initialed it, was that because you remember[ed] that's the guy that you saw?

"[Tania:]  Yes.

"[Prosecutor:]  It wasn't because your father picked him?

"[Tania:]  No.  My father picked the second."

The People liken the identification to that in *Simmons v. United States*, *supra*, 390 U.S. 377, where the United States Supreme Court found the pretrial photographs shown to the bank robbery witnesses was not impermissibly suggestive because it was not likely that the procedures used led to a misidentification of defendant.  (*Id*. at pp. 384-386.) The facts in *Simmons* are distinguishable.  In *Simmons*, each witness viewed the photographic display separately, all of the witnesses were neutral witnesses, and none was told or saw which photographs the others saw.  (*Id*. at p. 385.)

The People also compare the instant case to *Stovall v. Denno* (1967) 388 U.S. 293, 302 [87 S.Ct. 1967,18 L.Ed.3d 1199], which permitted a one-person show-up when it is necessary.  In *Stovall*, the United States Supreme Court found that because it was imperative for the police to conduct a one-person show-up to the witness in a hospital immediately after the crime, the show-up did not violate due process:  "'Here was the

only person in the world who could possibly exonerate [the defendant].  Her words, and only her words, "He is not the man" could have resulted in freedom for [the defendant].  The hospital was not far distant from the courthouse and jail.  No one knew how long [the witness] might live.  Faced with the responsibility of identifying the attacker, with the need for immediate action and with the knowledge that [the witness] could not visit the jail, the police followed the only feasible procedure and took [the defendant] to the hospital room.  Under these circumstances, the usual police station line-up, which [the defendant] . . . argue[d] he should have had, was out of the question.'" (*Ibid*.)  Also, one-person show-ups are encouraged for purposes of in-field identifications "because the element of suggestiveness inherent in the procedure is offset by the reliability of an identification made while the events are fresh in the witness's mind . . . ." (*In re Carlos M.* (1990) 220 Cal.App.3d 372, 387.)

While the circumstances in *Stovall* are similar to the instant case in some ways, *Stovall* does not preclude a finding that the identification by Tania was arguably tainted by the procedure used.  While it certainly would have been reasonable to attempt to obtain an immediate identification from Nelson, when he had been stabbed five times and was on a ventilator and it was unclear whether he would survive, this was not the case with Tania.  *Stovall* thus is distinguishable because, in the instant case, it certainly was not necessary to have Tania witness her father's identification of defendant.

The problem here is not in the procedure used, but in allowing Tania to be part of the identification procedure used with Nelson.  While it was certainly appropriate for Detective Guzman to attempt to obtain an identification from Nelson at the hospital, the problem arose when Detective Guzman asked Tania to witness her father's six-pack identification.  In defense of Detective Guzman, an experienced law enforcement officer, at the time he asked Tania to witness the six-pack identification, he was not aware that Tania was a witness the night of the assault.  After Detective Guzman learned that Tania was a witness, he had her make a six-pack identification.  Although he admonished her before asking her to view the six-pack, the procedure used, under the circumstances, was less than ideal.

9

It is obvious that the procedure used was tainted. Tania had witnessed her father, who was in a hospital on a ventilator, after being viciously attacked by a knife, identify defendant as the person who stabbed him and, shortly thereafter, identified the same photograph. During her testimony, Tania was asked by the prosecutor if she recognized anyone in the courtroom, and she replied "Just him. . . . The guy that stabbed my dad." The prosecutor asked if this was the same man the woman was talking to when she said "the man that stabbed your dad." Tania said, "Yes, it was this one."

During Detective Guzman's testimony, he revealed that he showed the photographic identification first to the father. On cross-examination, he testified that when he pointed to defendant's photograph, Tania was present, but he did not know whether she saw her father point to defendant's photograph. Just a couple of minutes later, he read the same admonition to Tania and she also identified defendant's photograph. Detective Guzman acknowledged that on People's Exhibit No. 8 it says, "I, Tania Guzman, witnessed my father choose number one as the person who stabbed him." The detective admitted that typically witnesses are asked to identify witnesses separately, but because he did not know whether Nelson would survive, he needed a witness to Nelson's identification.

Right after this testimony was elicited, defendant's attorney moved to exclude Tania's identification based on a tainted pretrial identification. The court correctly noted that it was a little late because the jury already heard it. The court did indicate the following: "I'm real concerned about . . . this I.D. issue. It's incredibly suggestive." The court further noted, "If in fact he says he wanted her to be a witness to the father's I.D., then he asked her to pick it out after the father does. How can you get much more suggestive than that?" What Detective Guzman was "supposed to do is not have [Tania] witness [Nelson's identification], and have someone else witness it."

We agree with the trial court that the circumstances under which Tania made her pretrial identification of defendant were impermissibly suggestive. Since the jury had already heard Tania's testimony regarding her identification, the trial court excluded the photographic six-pack from evidence and included in the instruction on evaluating

10

eyewitness identification testimony the following: "Was an identification in the photo line-up tainted by the witness observing another person identifying the same photograph of . . . defendant?"

We find that the trial court's admission of Tania's in-court identification following an impermissibly suggestive pretrial identification was harmless beyond a reasonable doubt. (*Chapman v. California* (1967) 386 U.S. 18, 24 [87 S.Ct. 824, 17 L.Ed.2d 705].) Even with the tainted identification by Tania, the evidence was overwhelming and supported the jury's conviction of defendant.

Nelson, the victim of the attack, identified defendant as the man who stabbed him, not once or twice, but three times within a short period of time following the stabbing. Nelson identified defendant by his photograph, by name, and by his vehicle. The identification was corroborated by the video of the unpleasant exchange between Nelson and defendant. Although the video did not show the actual stabbing, it did show the encounter: Nelson, while intoxicated, approached defendant's girlfriend, Velasquez, and defendant questioned Nelson about his actions.

The knife was found two blocks from where Nelson was stabbed, along the route followed by defendant when he left the scene of the attack. DNA testing revealed large quantities of defendant's DNA on the handle. The blade contained a mixture of Nelson's and defendant's DNA.

Velasquez indicated that shortly after the stabbing, defendant was attacked by two men who were saying the name of "Nelson" as they beat up defendant. A reasonable inference is that defendant was attacked by Nelson's friends for the stabbing.

Where tainted eyewitness identification is admitted, ""'"[c]ounsel can both cross-examine the identification witnesses and argue in summation as to factors causing doubts as to the accuracy of the identification—including reference to both any suggestibility in the identification procedure and any countervailing testimony such as alibi."'" [Citations.] [¶] Here defense counsel did indeed cross-examine [the witness] on her identification and argued against its reliability, and did so vigorously. [In addition, the jury was instructed regarding eyewitness identification and suggestive lineups.] There was no

11

denial of due process." (*People v. Gordon* (1990) 50 Cal.3d 1223, 1243-1244, fn. omitted.)  In the instant case, counsel emphasized to the jury—via cross examination, closing argument, and jury instructions—that Tania did not witness the stabbing and that her identification of defendant was made after she witnessed her father's identification.

Tania's identification merely corroborated the overwhelming evidence establishing defendant's guilt.  The error was harmless beyond a reasonable doubt.

## DISPOSITION

The judgment is affirmed.

JACKSON, J.

We concur:

PERLUSS, P. J.

ZELON, J.